13 - MJ - 2017 - MBB

<u>AFFIDAVIT OF SPECIAL AGENT DANIEL R. ROMANZO</u>

I, Special Agent Daniel R. Romanzo, depose and state as follows:

## I. INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have been employed as a Special Agent for approximately 16 years.  During that time, I have been involved in dozens of investigations relating to a wide variety of suspected criminal activity, including, among other things, drug and firearms trafficking by organized street gangs, organized and violent crime, terrorism, and computer crime.  Since May 2011, I have been assigned to the FBI's Violent Crime Task Force which investigates, among other matters, kidnappings, bank robberies, armored car robberies, and robberies/burglaries of commercial institutions involved in interstate commerce, and extortion.

2.   Based on my training and experience, I know that it is a violation of federal law, 18 U.S.C. §875(d) (Interstate Communications), to extort from any person, any money or thing of value, and transmit in interstate or foreign communication any communication containing a threat to injure the property or reputation of the addressee.

3.   I have been involved in an investigation of the activities of Felix **PAULINO** (date of birth --/--/78, and social security number XXX-XX-4550).  I submit this affidavit in support of a criminal complaint charging **FELIX PAULINO** with extorting and attempting to

extort money from a person, hereinafter known as John Doe, and transmitting in interstate commerce communications containing a threat to injure the reputation of John Doe, in violation of 18 U.S.C. §875(d)

4.    The information contained in this affidavit is based on my own investigation; oral and written reports by other law enforcement officers; physical surveillance; information from a cooperating individual and an undercover FBI Special Agent; public records; database checks; and review of audio and video recordings. The dates and times in this affidavit are approximate.   Because this affidavit is submitted for the limited purpose of supporting issuance of a criminal complaint, I have not presented every fact learned during the investigation, but only that information necessary to fully support probable cause for a warrant.

5.    As part of the investigation of the defendant, the FBI has utilized a cooperating individual ("the Cooperator") whose identity is known to me, and an FBI Undercover Employee ("UCE"), during the course of this investigation.

2

## II. Initial Contact

6. Beginning in October of 2012, a voice message was left to an agent who represents the victim, John Doe, a well-known Boston personality. John Doe is married. The agent for John Doe received a phone message on Monday, October 22, 2012 at approximately 9:00 a.m. from an unidentified caller.  In the voice mail message, the caller stated to the agent that the caller had "incriminating evidence against one of your clients" and requested the agent to call him back at 978-902-0663.[1]  The message further stated, "If you don't get back to me, I will go viral.  I will go viral.  If I were you, I'd make that call."[2]

7.  As a result of receiving the voice mail, the Cooperator was contacted and the Cooperator returned the phone call to 978-902-0663.  During this and other calls, an individual, later identified as **FELIX PAULINO**, explained to the Cooperator that he had a three minute video of John Doe at a private backroom of the

---

[1] During the course of the investigation I conducted a review of public records for the telephone number provided by "Felix", 978-902-0663, and answered by "Felix".  The results revealed the telephone number was associated with Felix Alfredo PAULINO, Jr. with the most recent addresses of: 23 Arlington St, Apartment 1, Lowell, MA; 19 Bellevue St, Apartment 1, Lawrence, MA; 9 Bassett St, Lowell, MA; and 590 Merrimack Ave, Apt. 11, Dracut, MA.

[2] I interpreted "go viral" as disseminating to media outlets, including internet websites.

nightclub "Venu" located in Boston, Massachusetts.  Felix **PAULINO** further claimed that the video depicted John Doe talking to several young women and attempting to lure them to his room.  Felix **PAULINO** told the Cooperator that John Doe touches the young women, and tells them that he is a "player" and they are not.  Felix **PAULINO** told the Cooperator that he wanted John Doe's phone number so he could negotiate with him directly.   The Cooperator declined to provide the number and told Felix **PAULINO** that he [the Cooperator] handled these matters.   Felix then told the Cooperator that he would sell the three minute video to [celebrity news website and outlet] TMZ unless the Cooperator met him in person to negotiate the matter.

**III. FBI Involvement**

8. Subsequent to initial unrecorded calls, the Cooperator contacted the FBI.  Beginning on about October 25, 2012[3], and continuing until approximately November 6, 2012, at the behest of the FBI, there were multiple recorded phone calls between the Cooperator and FELIX **PAULINO**.  Phone calls to FELIX **PAULINO** were placed to 978-902-0663. During these calls, among other things,

---

[3] On Thursday, October 25, 2012, the cooperator placed a recorded telephone call to Felix at 978-902-0663 while the cooperator was in Florida.  A person named "Felix" answered the phone and told the cooperator that he appreciated the return phone call as he planned to release the tape on Friday if a call had not been returned.

4

FELIX **PAULINO** told the Cooperator that he had the video tape and that he planned to release it.[4] During the course of these multiple conversations, FELIX **PAULINO**, at various times, advised he had a video tape of himself with John Doe in a club named "VENU" in Boston and was a "breath away" from John Doe at the time. When the Cooperator asked Felix if he was 100% sure the person in the video was, in fact, John Doe, Felix responded he would send a still photo of the video as proof. Felix further stated that John Doe was in the club trying to lure girls back with him and that the tape was about two minutes long. Felix told the Cooperator he wanted to meet in person to discuss the amount of money for the tape, and later in the conversation stated he thought $20,000 was appropriate for the tape.

9. In recorded conversations, FELIX **PAULINO** asked, among other things, if the Cooperator had spoken with John Doe. Felix **PAULINO** asked if the Cooperator had "asked him [John Doe] about the payment?" and also stated: "Ask him about the club?" and "Ask him about the back room?"[5] Felix explained to the Cooperator that he [the

---

[4] I interpreted the "release" of the tape to mean distribution to various media outlets in an effort to achieve "viral" status as previously stated by Felix.

[5] I interpreted questions from Felix about the "backroom" and "the

Cooperator] would have the only copy of the tape once the money was paid, and that he was willing to write and sign an agreement [about the exchange of money for the video tape].

10.   During this time, I am aware that there were media reports in both newspapers and on television information regarding John Doe's financial situation. During the course of this investigation, in a recorded phone call, FELIX **PAULINO** referenced the information about John Doe's financial situation.

11. In November of 2012, the Cooperator and FELIX **PAULINO** discussed meeting with one another. **PAULINO** initially agreed to meet the Cooperator at the hotel, but later refused to meet at a hotel. During multiple recorded calls to **PAULINO** at 978-902-0663, **PAULINO** heatedly explained his refusal to meet at a hotel stating he "wanted to feel comfortable."   **PAULINO**'s comments included the following: "I ain't going to no fuckin' hotel"; that he didn't want to feel "trapped"; and that he wanted to meet "in a public place."   When offered to meet in the hotel lobby, or at a public place such as a

---

club" as a reference to the "incriminating evidence" on the tape which could be damaging to the reputation of John Doe.

nearby Dunkin' Donuts, **PAULINO** refused and terminated the discussion by stating "you'll see my video, man; you'll see my video, man."[6]

12.   The Cooperator and **PAULINO** negotiated, at times in an agitated manner, to meet in a public place; to see the video, and to discuss the demand for money.   **PAULINO** offered to send the Cooperator "stills" [still photos] from the video when the Cooperator explained that money would not be paid today.   **PAULINO** then offered to meet and allow the Cooperator to " . . . see the video, you tell me what you think it's worth, because I'll let you know what other people think it's worth. **PAULINO** later assured the Cooperator that he would not further release the video once money was paid. He stated he would sign an affidavit and, "if anything gets released after that on my behalf – because obviously I'm in the fucking video. You see what I'm saying?   I'm in the video!"

13.   Later, **PAULINO** agreed to e-mail the Cooperator a copy of the video.   **PAULINO** sent the video, which was in two files, to the e-mail account of an FBI Undercover Employee.   The e-mail originated from flex978@yahoo.com and was sent on November 5, 2012 at 7:41pm. Attached to the e-mail was a facial photograph.   I compared the photo

---

[6] I interpreted PAULINO's concluding statement to mean he would release the video as the terms of the meeting were not to PAULINO's liking.

attached to the e-mail and a Massachusetts Registry of Motor Vehicles Driver's license photograph of **PAULINO** and believe the two photographs are of the same person.[7]

14. During the evening of the same day (November 5, 2012), the Cooperator placed a recorded call to **PAULINO** at 978-902-0663. **PAULINO** asked if the Cooperator received the video.  The Cooperator responded that he had, and that John Doe reviewed the video and was interested in doing something with **PAULINO**.   The Cooperator explained to **PAULINO** twice that this is something they "don't want to hit the press" and wanted to reach an agreement with **PAULINO**. **PAULINO** agreed responding, "Like I said, if you want to fill out an affidavit – this thing . . . We'll get it done.  Anything you guys . . . whatever you want to do."  **PAULINO** agreed to sign an affidavit when asked by the Cooperator.[8]

_____

[7] I reviewed the approximately two minute video sent by PAULINO which showed John Doe at what appears to be a nightclub with other patrons including female patrons.  One of the persons in the video looks at the video camera directly.  I compared the person in the video with a driver's license photograph of PAULINO and concluded they were of the same person.  I cannot be certain that PAULINO sent the entirety of the video, or that he has other videos of John Doe.

[8] I then drafted an "affidavit" which was sent to PAULINO's e-mail address at flex978@yahoo.com.  Later that same day, the Cooperator spoke to PAULINO during a recorded phone call. PAULINO told the Cooperator he received the affidavit and agreed

15.    The Cooperator and **PAULINO** agreed to meet the following day, November 6, 2012, at a restaurant and conclude the deal with **PAULINO** signing an affidavit to not further disseminate the video, and exchanging the video for money.   **PAULINO** asked the Cooperator if he showed JOHN DOE the video, and he responded he had.   Further in the conversation, **PAULINO** told the Cooperator that he was planning to bring people with him to the meeting stating, "So, just let me, I mean, you know, I am bringing people with me"; "It's just me and you seeing other people, correct?"; and later stating, "No, I said I'm bringing someone with me – like, driving."

16.    On Tuesday, November 6, 2012, the Cooperator placed a recorded call to **PAULINO** at 978-902-0663.   The two confirmed their meeting later that day.   **PAULINO** asked the Cooperator to send him a copy of the "affidavit" to review prior to the meeting.   **PAULINO** told the Cooperator that the affidavit should read, "What I want on there is that you – you're putting this through our – offering me some money for the tape."   He later agreed to include a statement that he would not further give the tape to anyone else for money.

---

with it stating, "I'm cool with that, man."   When told by the Cooperator that similar situations "have happened to us before", PAULINO responded, "Trust me . . . you don't think I know that? I know that."

9

PAULINO later told the Cooperator, "Put it all in there.   I'm trying to make it official with you; I'm trying to make it legit."

17.   The meeting did not take place. At approximately 7:00 p.m. on November 6, 2012, exterior surveillance personnel observed PAULINO looking at them and then speaking on his phone.   At the same time, surveillance personnel inside the restaurant observed one of the two males receive a phone call.   The two males then abruptly departed.   The three then walked to PAULINO's vehicle and departed driving at a high rate of speed toward Lowell, MA.   PAULINO then stopped at 24 Cady St, Lowell, MA and again on Chase St, Lowell, MA. Shortly after PAULINO departed the restaurant, the Cooperator received the following text message from PAULINO's phone number, "You fucked up tell [John Doe] it's your fault."   When asked to explain and call the Cooperator, PAULINO responded, "You know … I'm smarter then [sic] you think ta ta now"; and "No I'm done bye".

18. Based on the above, I believe probable cause exists to conclude that, beginning in October of 2012, within the District of Massachusetts, Felix A. PAULINO, with intent to extort from a person, did extort money from a person, hereinafter known as John Doe, and transmitted in interstate commerce, communications containing a

threat to injure the reputation of John Doe, all in violation of 18

U.S.C. §875(d).

Daniel R. ~~Romanzo~~
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 1st th day of April, 2013.

MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE